IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

HILLARY WESTFALL,

    Petitioner,                    No. CIV S-09-3211 EFB P

    vs.

TINA HORNBEAK,

    Respondent.                ORDER

_____/

       Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a 2006 judgment of conviction entered against her in the Sacramento County Superior Court on a charge of first degree murder with use of a weapon. She seeks relief on the grounds that the evidence introduced at her trial was insufficient to support her conviction, and the trial court violated state law when it denied her motion for a new trial. Upon careful consideration of the record and the applicable law, and for the reasons set forth below, petitioner's application for habeas corpus relief must be denied.

/////

/////

/////

1

## I. Background[1]

A jury convicted defendant Hillary Westfall of first degree murder, and found she personally and intentionally discharged a firearm. (Pen.Code §§ 187, subd. (a), 12022.53, subd. (d), respectively.) Sentenced to a prison term of 50 years to life, defendant argues on appeal that there was insufficient evidence to sustain her conviction and firearm finding, and that the trial court failed to independently review the evidence on her new trial motion. We shall affirm.

**Background**

Because defendant challenges the sufficiency of the evidence, we state the facts in detail so we may thoroughly examine her argument.

At 5:38 a.m. on February 8, 2004, defendant placed a 911 call stating she had just returned home to find her boyfriend, Rusty Davis (victim or boyfriend), bleeding on the love seat and nonresponsive.[2] Police officers arrived minutes later and found the victim slumped on the love seat with a single gunshot entry wound to the back of his neck. A paramedic arrived at 5:45 a.m. and confirmed that the victim was dead. The paramedic opined that the victim had died within the last few hours. The victim was last seen alive at his home around 2:30 or 3:00 a.m. There was no evidence of forced entry or ransacking. Samples from defendant's right hand tested positive for gunshot residue. Defendant did not have blood on her hands or clothes.

Apparently, defendant referred to the victim as her husband, as did many witnesses. However, defendant and the victim were never legally married and we refer to the victim as defendant's boyfriend.

On the evening of February 7, defendant and the victim were packing items for a planned move to a new house. The victim's mother, Patricia D. (Patricia), had arrived a few days earlier to help the couple with their move and helped them pack that evening. Patricia noticed that defendant became upset at several points during the packing because of something the victim had done or

---

[1] In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

[2] The victim was found on the love seat, but several witnesses described this piece of furniture as a couch. Defendant also stated that the victim was on the couch in the 911 call. There was a couch adjacent to the love seat. For purposes of clarity, we refer to this particular piece of furniture as a love seat.

2

something defendant had found. Patricia testified that the victim was tired that evening and dozed on the couch several times. Patricia left defendant's residence around 2:30 or 3:00 a.m. Patricia testified that when she left defendant's residence the victim was sitting on the love seat asleep. Patricia believed that she and defendant left the residence about the same time.

Patricia returned to her room at a Motel 6. She took a sleeping pill, ate a snack, and took a shower. Patricia testified that defendant called her from a Walgreens store and asked her if she wanted anything. Defendant indicated that she would come to the Motel 6 to pay for Patricia's next few nights and would bring her something to eat. Patricia testified that she thought defendant came to her room between 10 and 30 minutes after the phone call, but it was hard to give a correct estimate because she had already taken the sleeping pill, so "time kind of drags." Patricia estimated that once defendant arrived, they were in the motel room together for about 30 or 45 minutes. At one point, defendant dropped her cellular phone in the toilet and asked Patricia to call the phone to see whether it still worked. Patricia's phone records show that she made a call to defendant's cell phone at 4:56 a.m. Patricia testified that defendant left her hotel room about 20 minutes after making the call.

Video surveillance tapes from Walgreens showed that defendant entered the store at 2:52 a.m. and left at 3:14 a.m. A Chevron gas station video surveillance tape indicated that defendant was at the station at 3:24 a.m. Motel 6 records showed that Patricia's room was paid for at 3:38 a.m. and a new key card was issued at 3:45 a.m.[3]

Kelley E. (Kelley), the ex-girlfriend of defendant's neighbor, Tony B. (Tony), testified that she drove home from a girlfriend's house at approximately 4:00 a.m. on February 8. At the time of the victim's murder, the victim and defendant were living at 1344 Shadowglen Road. Tony was living at 1336 Shadowglen Road, one house away from the victim's residence. Kelley decided to take a route close to Tony's house to see if Tony was awake. Kelley drove down Glenwood Road, which intersects with Shadowglen, and looked down Shadowglen for any indications that Tony was up. Kelley also observed defendant's residence because Tony and the victim were friends, and Tony often spent time there. Kelley testified that she saw defendant's silver

---

[3] An investigating detective checked the Chevron time stamp and the Motel 6 cash register to determine whether their times were correct. The Chevron stamp was three minutes fast and the Motel 6 cash register was five minutes slow. The times above reflect the true times that defendant was at the Chevron station and made the Motel 6 payment, as opposed to the time stamped in the Motel 6 and Chevron records. The detective did not check whether the Motel 6 key card system was on the same clock system as the cash register.

Mustang convertible in the driveway of defendant's residence. Kelley knew that this was defendant's car because she had seen defendant drive it on several occasions. Kelley testified that it was 4:06 a.m. when she made these observations. Kelley stated that she remembered the time because she looked at the clock and realized how late it was, and thought that Tony should be asleep at that time of night.

The investigating detective testified that it takes eight minutes to drive between the Motel 6 and defendant's residence in light traffic conditions. The prosecution theorized that defendant paid for the Motel 6 room at 3:45 a.m., returned home to kill the victim, and drove back to the Motel 6 to have the victim's mother provide an alibi.

Several witnesses testified to defendant's motive for the offense. Terri F. (Terri), Brian W., and Jennifer B. (Jennifer), members of defendant's study group at the University of Phoenix, testified that defendant had stated that her boyfriend was abusive and had cheated on her, and she "wanted to get rid of" him. Defendant told the group that she wanted her boyfriend dead and repeatedly asked Terri if she knew someone who could assist her. Defendant told Terri that she wanted to have her boyfriend "taken care of." Marival B., another member of defendant's study group, gave a statement indicating that on several occasions defendant said she wished someone would kill her boyfriend. Jennifer added that defendant said her boyfriend was afraid that she would poison him when she cooked him food, so he would feed the food to her beloved dog first. Defendant made these statements in the few months preceding the victim's death.

Several of defendant's employees (defendant ran a lucrative escort service and apparently also an online adult store) also testified along similar lines. Jacqueline F. (Jacqueline) testified that defendant said her boyfriend was cheating on her and she wanted him to die. Crystal W. (Crystal) testified that defendant stated she wanted her boyfriend "dead [and] gone" and expressed interest when Crystal said her father had possible mob connections; defendant indicated that she thought they would know "how to take care of people [and] get away with it." Defendant asked Crystal to talk to her father about paying to have her boyfriend killed and wanted to make it look like an accident. Defendant mentioned that if her boyfriend was shot, it should look like a gang-related shooting because her boyfriend had a lot of enemies and no one would be surprised. A few weeks before the murder, defendant solicited Crystal's boyfriend to have the victim "taken care of," but he did not take her remarks seriously. Crystal also testified that defendant told her that she used to put sleeping pills and Valium in her boyfriend's food, and she talked about putting rat poison in his food.

4

> There was additional evidence to suggest that defendant was secretly trying to leave the victim. A few months before the victim's death, defendant rented a duplex in West Sacramento and told the owner that she "wanted to leave her [boyfriend] and . . . find her own place." Jacqueline also stated that defendant was trying to move out of her house to a duplex in West Sacramento she had recently rented without her boyfriend's knowledge. Jacqueline helped defendant move small items to the duplex so her boyfriend would not notice. Defendant told Jacqueline she was afraid that her boyfriend would not let her move if he found out her plan. Crystal, who was living at the duplex in West Sacramento, received a call from defendant one week before the victim's murder warning Crystal to lock the doors to the duplex. Defendant told Crystal that her boyfriend had discovered a rent check for the duplex and worried that he might "get violent" with Crystal.

Resp.'s Lodg. Doc. 4 (hereinafter Opinion), at 1-7.

## II.  Analysis

### A. Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

5

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. *Early v. Packer*, 537 U.S. 3, 7 (2002) (*citing Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (internal citations omitted) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008). *See also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court

decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784-85 (2011). That presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). However, when it is clear that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Id.* Where no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784.

**B. Petitioner's Claims**

Petitioner's first and third grounds for relief constitute a single claim that the evidence introduced at her trial was insufficient to support her conviction. In ground one, petitioner argues that "the evidence showed that defendant could not have committed the crime." Pet. at 5.

////

////

////

7

She explains:

> Evidence indicates that defendant was with the victim's mother from 3:45 am to 5:00 am at a motel and was at Walgreens at 3:13 am shopping.  The victim was shot at approximately 4:00 am.  It is undisputed that the keycard at the motel was used at 3:45 am and that defendant did not leave prior to 5:00 am.  A prosecution witness stated that she saw nothing unusual at the victim and defendants house at the time of the shooting, but did state that she saw defendants car in the driveway.  Apparently, the witness was drunk at the time of the shooting and her statements to police. This witness did not testify to any specifics regarding the vehicle, only that it was the same color and type as one defendant drove.  The timeline does not support the conviction and was not possible.  The prosecution alleges that after the murder, defendant returned to the motel to laugh and watch movies with the victim's mother, without showing any emotion.  Trial evidence showed defendant to be an emotional talkative woman who spoke openly with total strangers.  Her 911 call to police upon finding the body of the victim was emotional and showed how upset she was.

*Id.*  In ground three, petitioner claims that "a reasonable juror could not find Defendant guilty beyond a reasonable doubt."  Dckt. 1-1 at 1.  She explains:

> The evidence was not sufficient to convict defendant on either PC 187 or the enhancement charge.  The crucial piece of evidence linking defendant to the shooting was Ms. Elliot's testimony was that she had been drinking and feel [sic] asleep at a friends home.  She woke up and decided to stalk an ex boyfriend who lived next door to the victim.  She recalls defendants car in the driveway of the home when she drove by her ex boyfriends house, but not the victim's larger Expedition.  However, the Expedition was parked in the driveway.  Ms. Elliot also could not remember the condition of the garage door or if lights were on.  Ms. Elliot did not know if the car in the driveway was in fact defendants as she did not get out of her vehicle to look at the car.

*Id.*

The California Court of Appeal rejected petitioner's claim of insufficient evidence, reasoning as follows:

### 1. **Sufficiency of the Evidence**

### 1. Standard of Review

In an appeal based on the sufficiency of the evidence, we review the record in the light most favorable to the judgment.  (*People v..*

8

*Lewis* (2001) 26 Cal.4th 334, 365, citing *People v. Kraft* (2000) 23 Cal.4th 978, 1053.) Substantial evidence is "'evidence that is reasonable, credible and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*Ibid., italics added.*) When reviewing a sufficiency of the evidence challenge, "our opinion that the evidence could reasonably be reconciled with a finding of innocence or a lesser degree of crime does not warrant a reversal of the judgment." (*People v. Hill* (1998) 17 Cal.4th 800, 849, citing *People v. Bean* (1988) 46 Cal.3d 919, 933.) The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792, citing *Bean, supra*, at p. 932.)

**2. Sufficiency of the Evidence**

Defendant contends that the evidence is insufficient to prove she shot the victim. Defendant alleges that the timeline of events conclusively shows that she was not at the scene of the crime when the shooting occurred. We disagree with defendant's characterization of the evidence, and instead find that substantial evidence exists to uphold defendant's conviction and firearm finding.

Defendant's claim that Patricia's testimony provides an indisputable alibi that defendant was with Patricia from 3:45 a.m. to roughly 5:00 a.m. is erroneous. Patricia testified that defendant came to her hotel room between 10 and 30 minutes after defendant's phone call from Walgreens, which would indeed place her in Patricia's hotel room around 3:45 a.m. However, Patricia also testified that she had taken a sleeping pill upon arriving at the motel room and was very sleepy. Patricia testified that "time kind of drags" when she takes a sleeping pill and admitted that she could not give a good estimate of how much time had passed between defendant's call and her arrival in the hotel room. Additionally, Patricia testified that defendant was with her in the motel room for about 30 or 45 minutes, but probably not as long as 90 minutes. If defendant had arrived at Patricia's room at 3:45 a.m., she would have spent at least 90 minutes in the room (based on evidence of Patricia's call to defendant's cell phone at 4:56 a.m., and Patricia's testimony that defendant did not leave and return). Therefore, Patricia's testimony with regard to the timing of events is not a model of clarity, if not contradictory.

Moreover, an eyewitness placed defendant's car at the scene of the crime during the time defendant could have driven home to murder the victim. Kelley testified that she saw defendant's silver Mustang parked in the driveway of the victim's residence at 4:06 a.m. Kelley testified that she remembered it was 4:06 a.m. because she looked at the clock after observing Tony's (her ex-boyfriend's) house and the victim's residence one house away and realized that

it was appropriate that Tony was asleep so late at night. Apparently, the jury gave Kelley's testimony more weight than Patricia's on the issue of timing, and we may not disturb this evaluation on appeal. (*See People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 ["'if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder'"].) Additionally, the investigating detective testified that driving between the victim's residence and the Motel 6 in light traffic conditions takes only eight minutes. Therefore, defendant had time to leave the Motel 6 office at 3:45 a.m., return home to shoot the victim, and arrive at Patricia's hotel room not long thereafter.

Furthermore, defendant's right hand tested positive for gunshot residue. The defense claimed this was because defendant had touched the victim when she found him on the love seat. However, the jury was not obliged to believe that explanation and could reasonably have concluded that the gunshot residue was a result of her shooting the victim.

Additionally, defendant made several statements in the 911 call that were inconsistent with evidence found on the victim and on defendant. First, in response to the 911 operator's request to get the victim flat on the floor, defendant stated that she was trying to move him but couldn't get him on the floor because he was "really heavy." However, the coroner, who was a petite woman, testified that she had no difficulty moving the victim by grabbing his arm. Second, defendant claimed that she tried to move the victim, which would have resulted in smearing the blood on the love seat. Defendant also told Jennifer (a fellow student) that she started shaking the victim's shoulder when she came home. However, the coroner testified that there were no signs of blood smears or movement when she arrived, which indicates that defendant did not attempt to move the victim as claimed. Third, defendant did not have any blood on her hands or clothes, and the victim's right hand had blood on it when it was examined. These facts are inconsistent with defendant's claim that she tried to move the defendant. Fourth, samples from defendant's right hand tested positive for gunshot residue, though it appears that defendant did not actually touch the victim after he was shot. Fifth, defendant repeatedly stated that the victim was "really cold" and "freezing cold" to her touch. While the deputy sheriff did note that the victim's neck was cold to the touch, the paramedic noticed that the body was warm and rigor had not yet set in.

A review of the record in the light most favorable to the judgment shows that substantial evidence supports the conviction and firearm finding. Defendant's motive was clearly established. Apparently, even the victim suspected defendant of trying to poison him. Defendant had a window of time in which to kill the victim, dispose of the murder weapon, and then visit Patricia at the

> Motel 6. Defendant's right hand tested positive for gunshot residue. Following the murder, defendant gave statements in her 911 call that were inconsistent with evidence found at the scene of the crime. These and other facts, most notably the observation of defendant's car parked outside her house at the time of the murder, defendant's knowledge that the victim was sleeping on the love seat when she left, and lack of signs of ransacking or forced entry, warranted the jury in finding defendant guilty of murder and the gun enhancement.

Opinion at 7-11.

There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[T]he dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318). A petitioner in a federal habeas corpus proceeding "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005). In order to grant the writ, the habeas court must find that the decision of the state court reflected an objectively unreasonable application of *Jackson* and *Winship* to the facts of the case. *Id.*

The court must review the entire record when the sufficiency of the evidence is challenged in habeas proceedings. *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985), *vacated on other grounds*, 789 F.2d 722 (9th Cir. 1986) (en banc), *rev'd*, 483 U.S. 1 (1987). It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. *Turner v. Calderon*, 281 F.3d 851, 881-82 (9th Cir. 2002). The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict. *United States v. Mares*, 940 F.2d 455,

458 (9th Cir. 1991). The federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

Viewing the evidence in the light most favorable to the verdict, and for the reasons expressed by the state appellate court, there was sufficient evidence introduced at petitioner's trial to support the jury's verdict. As explained by the state court, there was sufficient evidence from which a rational jury could conclude that petitioner had time to shoot the victim and still visit the Motel 6, notwithstanding the timeline described by the victim's mother. In addition, the prosecution theory was bolstered by the testimony of Kelley E., who saw petitioner's car at the victim's house at 4:00 a.m., and also by petitioner's statements to the 911 operator, which conflicted with the physical evidence. As noted by the California Court of Appeal, it was entirely within the jury's prerogative to find more credible the prosecution's version of the facts surrounding the murder. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1023 (9th Cir. 2008). The conclusion of the state court that sufficient evidence supported the guilty verdict in this case is not contrary or an unreasonable application of United States Supreme Court authority. Accordingly, petitioner is not entitled to relief on this claim.

### 2. Motion for New Trial

In her second ground for relief, petitioner claims that the trial court "failed to properly review the evidence on the Motion for New Trial." Pet. at 7. She explains:

> Defense filed for a new trial claiming the evidence was insufficient to convict. The trial court ruling did not resolve the issue of how defendant could have been at the scene of the shooting when the victim's mother testified that she was with defendant. The trial court relied on defendant having particles of gunshot powder on her hands. The evidence at trial was that the residue was consistent with defendant touching the victim when she found the body. Had the trial court properly exercised its duty to review the evidence it would have concluded that there was insufficient evidence that defendant shot the victim. The trial court only reviewed the evidence relating to motive or a desire for the victims death. The defendant should not be convicted based on "desires" but based on actual evidence.

12

*Id.*

The California Court of Appeal rejected these arguments, reasoning as follows:

> **Trial Court's Denial of New Trial Motion Alleging Insufficient Evidence**
>
> Defendant also claims that the trial court failed to properly review the evidence on the motion for new trial. Specifically, defendant alleges that the trial court did not independently weigh the evidence regarding the issue of whether defendant had the opportunity to murder the victim.
>
> In ruling on a motion for new trial that alleges insufficient evidence, the trial court is to determine independently whether it is persuaded that there is sufficient credible evidence to sustain the verdict. (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1252, citing *People v. Robarge* (1953) 41 Cal.2d 628, 634.) We review a trial court's determination of a motion for a new trial for abuse of discretion. (*People v. Davis* (1995) 10 Cal.4th 463, 524.)
>
> A review of the trial court's ruling on the new trial motion shows that the court complied with its duty to independently review the evidence. In this ruling, the court went through the evidence and mentioned several specific items it found persuasive. Although the court did not explicitly discuss the issue of whether defendant had the opportunity to commit murder, the court's detailed summary of the evidence shows that it determined independently that the evidence was sufficient to convict defendant. There is no indication that the court believed it was bound by the jury's decision in so ruling. Therefore, we find that the trial court did not abuse its discretion when it denied defendant's motion for new trial.

Opinion at 11-12.

Petitioner cites no federal cases in support of this claim, nor does she explain how the state court decision on her motion for new trial violates the federal constitution or a federal statute. Rather, the claim is based on the trial court's alleged misapplication of state law.[4] A challenge to a state court's interpretation of state law is not cognizable in a federal habeas corpus petition. *See Waddington v. Sarausad*, 555 U.S. 179, 129 S.Ct. 823, 832 n.5 (2009) ("we have repeatedly held that 'it is not the province of a federal habeas court to reexamine state-court

---

[4] Petitioner's claim on direct appeal also relied solely on California cases and California law. Resp.'s Lodg. Doc. 1, at 18-22.

determinations on state-law questions"); *Rivera v. Illinois*, ___ U.S. ___, 129 S.Ct. 1446, 1454 (2009) ("[A] mere error of state law . . . is not a denial of due process") (quoting *Engle v. Isaac*, 456 U.S. 107, 121, n. 21 (1982) and *Estelle v. McGuire*, 502 U.S. 62, 67, 72-73 (1991)); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) "a state court's interpretation of state law . . . binds a federal court sitting in federal habeas"); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (federal habeas corpus relief does not lie for errors of state law).  To the extent petitioner is arguing that her conviction is not supported by sufficient evidence, she is not entitled to relief for the reasons set forth above.

### III. Conclusion

Accordingly, IT IS HEREBY ORDERED that:

1. Petitioner's application for a writ of habeas corpus is denied;

2. The Clerk is directed to close the case; and

3. The court declines to issue a certificate of appealability.

DATED: January 3, 2012.

_____
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE